IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

DAVID M. AMROD,

               Plaintiff,

     v.                         5:08-CV-00464 (DNH/DEP)

MICHAEL J. ASTRUE, Commissioner of
  Social Security,

               Defendant.

---

APPEARANCES:                       OF COUNSEL:

FOR PLAINTIFF:

LEGAL SERVICES                CHRISTOPHER CADIN, ESQ.
OF CENTRAL NEW YORK
472 South Salina Street
Suite 3000
Syracuse, New York 13202

FOR DEFENDANT:

HON. ANDREW T. BAXTER      SANDRA GROSSFIELD, ESQ.
United States Attorney          Special Assistant U.S. Attorney
Northern District of New York
Post Office Box 7198
100 South Clinton Street
Syracuse, New York, 13261-7198

SOCIAL SECURITY ADMINISTRATION  MARY ANN SLOAN, ESQ.
Office of the General Counsel      Chief Counsel, Region II
26 Federal Plaza - Room 3904
New York, New York 10278

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff David M. Amrod, who suffers from various medical conditions including anxiety disorder and post-concussion syndrome, has commenced this proceeding pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's denial of his applications seeking disability insurance benefits ("DIB") and supplemental social security income ("SSI") payments under the Social Security Act ("Act"). In support of his challenge plaintiff argues that the agency's finding that he was not disabled at the relevant times, a finding upon which the denial of benefits hinges, did not result from the application of correct legal principles and further lacks support of substantial evidence in the record. Specifically, plaintiff asserts that 1) the residual functional capacity ("RFC") determination that led to the finding of no disability is not supported and is inconsistent with evidence in the record, including opinions of Dr. Alan Landes, a psychologist; 2) the agency's determination improperly relies upon the medical vocational guidelines set forth in the governing regulations (the "grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, to satisfy the Commissioner's burden to establish the availability of jobs capable of

being performed by the plaintiff, despite his limitations and the fact that the limitations stemming from his mental condition substantially erode the job base upon which the grid is predicated, and that the testimony of a vocational expert should therefore have been elicited in order to meet that burden; and 3) the plaintiff's statements regarding his limitations were improperly rejected on credibility grounds, without proper explanation.  As relief, plaintiff seeks a remand of the matter to the agency, with a directed finding of disability, for the limited purpose of calculating benefits owing.

Having reviewed the record now before the court, considered in light of the parties' arguments and applying the requisite, deferential standard of review, I conclude that the agency's RFC finding is not supported by substantial evidence, and that the partial rejection of plaintiff's statements on credibility grounds was not properly explained.  Accordingly, I recommend that the Commissioner's determination be set aside and the matter be remanded for further consideration.

I.      BACKGROUND

Plaintiff was born in February of 1965; and was two days shy of forty-two years of age when the decision finding that he is not disabled

was issued.  Administrative Transcript at pp. 20, 39.[1]  Amrod is presently

divorced.  AT. 57, 81, 389.  He has one son, who has Asperger

Syndrome[2] and was six years old at the time of the hearing; while the son

resides principally with his mother, plaintiff enjoys overnight visitation

rights, customarily on Tuesday and Thursday nights.  AT 81, 229, 359,

389.  Amrod has completed two years of college education, and also is

trained in nursing.  AT 66, 391-92.

Plaintiff last regularly worked as a certified nursing assistant from

1987 through June of 1989, and thereafter as a licensed practical nurse

("LPN") up through March of 2003.  AT 58, 72.  Plaintiff stopped working,

however, based upon the residual affects of a head injury sustained in

July of 2002, causing him to experience blackouts and seizures to an

extent, he believed, that neither he nor his employer felt that it was safe

---

[1]      Portions of the Administrative Transcript (Dkt. No. 7), compiled by the
Commissioner and comprised in large part of the medical records and other evidence
before the agency when its decision was made, will be cited hereinafter as "AT ___."

[2]      Asperger Syndrome is a pervasive developmental disorder resembling
autistic disorder.  It is characterized by severe impairment of social interactions and by
restricted interests and behaviors, but lacks the delays in development of language,
cognitive function and self-help skills that additionally define autistic disorder.
DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1848 (31st ed. 2007).

for him to continue working.[3]  AT 393-94; *see also* AT 222, 273.

Plaintiff testified that over time he has sustained a total of twelve head injuries, which in combination have resulted in his inability to work on a regular, full-time basis.  AT 395-96.  Plaintiff testified that he cannot "drown out input visually or orally . . . and sometimes [gets] so stimulated that [he cannot] function.  I have to go to a dark quiet place."  AT 389.  He similarly stated that he cannot "shut down" his environment and that he has a "very low threshold for anxiety."  AT 395.   Plaintiff added that since his most recent head injury, he cannot handle more than a single doctor appointment in a day without requiring a nap.  AT 404.

Amrod reported that as he becomes more anxious, he begins to shake and stutter, and has difficulty "holding on to things."  AT 404.  Plaintiff also stated that his hands sometimes shake such that he has to hold his wrists, or stabilize his arms against a desk in order to type at a rate of seven to ten words per minute.  AT 391.  Plaintiff noted that he

---

[3]      Plaintiff has also reportedly managed "magic tournaments" on a sporadic basis.  AT 58, 72.  According to plaintiff's work activity report, that job entails working approximately six hours each week selling "Magic the Gathering" gaming cards on e-bay, and directing others to set up and run tournaments involving the gaming cards.  AT 53, 85, 214.  Based upon plaintiff's testimony, which reflected that the activity in fact yielded little if any income, in its decision the agency concluded that it did not rise to a level of substantial gainful activity as contemplated under the Act.  AT 15-16.

experiences auditory and visual hallucinations, such as mistakenly hearing the telephone ring or seeing people in a room.  AT 404.  He testified that because of his condition his personality has changed, and that he has difficulty concentrating.  AT 404-05.  Amrod similarly reported that his illnesses have affected his activities, in that he no longer helps with household chores, writes stories, composes or plays music, gardens, or runs card tournaments.  AT 93.

Plaintiff has received assistance for his condition from various sources, including through the New York State Department of Health Traumatic Brain Injury Waiver ("TBIW"), a program funded by Medicaid. AT 394-95, 402-03.  Intervention on the part of the TBIW, which provides plaintiff with a personal aid, has assisted him in organizing his daily activities, enabled him to care for his son, and assisted in eliminating an unsanitary condition at his apartment.[4]  AT 405-12.

Although the record does not disclose that plaintiff has sought and obtained extensive medical treatment for his head injuries and resulting

---

[4]     Pat Palumbo, the Director of Self-Direct, Inc., which has furnished the TBIW program services to plaintiff, explained that the service coordinator assists plaintiff with connecting with community resources.  AT 280.  Palumbo further explained that plaintiff receives independent living skills training and in-home assistance and supervision with everyday living tasks and skills.  *Id.*

seizures, it appears that over time his conditions have been treated

through a variety of medications including Diovan to control high blood

pressure,[5] Effexor XR to treat anxiety, depression and attention deficit

disorder,[6] Klonopin to treat anxiety[7], Welbutrin to treat anxiety and stress,[8]

and Risperidone to treat psychosis.[9]  AT 65, 295, 359, 360.  Plaintiff

reports, however, that he sometimes forgets to take his medications, and

that they cause side effects, including making him lethargic, exacerbating

his anxiety, and causing both weight gain and his heart to race.  AT 397.

Plaintiff was interviewed and administered a battery of psychological

tests by Dr. Allan Landes, a psychology resident at SUNY Upstate

Medical University Hospital, over the period of March through June of

---

[5]    Diovan is a preparation of valsartan, an angiotensin II receptor agonist, used as an antihypertensive. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 529, 2049 (31st ed. 2007).

[6]    Effexor is a preparation of venlafaxine hydrochloride, a serotonin-norepinephrine reuptake inhibitor used as an antidepressant and antianxiety agent. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 602, 2074 (31st ed. 2007).

[7]    Klonopin is a preparation of clonazepam, a benzodiazepine used as, inter alia, an antipanic agent in the treatment of panic disorders. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 379, 1003 (31st ed. 2007).

[8]    Wellbutrin is a preparation of bupropion hydrochloride used, inter alia, as an antidepressant. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 265, 2107 (31st ed. 2007).

[9]    Risperidone is a benzisoxazole derivative used as an antipsychotic agent. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 212, 1674 (31st ed. 2007).

2005.  AT 236-38.  The results of Dr. Landes' evaluation are reported in an assessment dated August 25, 2005.   AT 273-77.  In that report, Dr. Landes characterized plaintiff as having above-average intellectual capacity, but noted his impression that plaintiff was experiencing significant distress and functional disability relative to cognitive dysfunction.  AT 276-77.  Dr. Landes further opined that it was unlikely plaintiff could function adequately in an occupational setting, noting that he was clearly disabled with respect to his previous occupation as an LPN.  AT 276.

After treating him briefly, including with a trial of low dose Risperdal,[10] on September 16, 2005 Dr. Landes completed a mental impairment questionnaire regarding the plaintiff.  AT 266-72, 279.   In it, Dr. Landes again noted his diagnoses of cognitive disorder and adjustment disorder with mixed emotional features, and assessed plaintiff's global assessment of functioning ("GAF") as fifty-five.[11]  AT 266.

---

[10]     Risperdal is a preparation of risperidone.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1674 (31st ed. 2007); see footnote 12, supra.

[11]     The GAF scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (Am. Psychiatric Assoc., 4th ed. Text Revision 2000) ("DSM-IV-TR").  The GAF of fifty-five indicates moderate difficulty in social, occupational or school functioning.  DSM-IV-TR at 34.

Dr. Landes identified several signs and symptoms supporting his

diagnoses, including poor memory; sleep disturbance; personality change;

mood disturbance; emotional lability; delusions or hallucinations; difficulty

in thinking or concentrating; oddities of thought, perception, speech, or

behavior; perceptual disturbances; social withdrawal or isolation; blunt,

flat, or inappropriate affect; illogical thinking or loosening of associations,

and decreased energy.  AT 267.  According to Dr. Landes, it could be

anticipated that plaintiff's impairments or treatment would cause him to be

absent from work more than three times per month.  AT 269.

        In his September 16, 2005 assessment Dr. Landes described as fair

plaintiff's abilities to remember work-like procedures, understand and

remember very short and simple instructions, and ask simple questions or

for assistance.  AT 269-70.  Dr. Landes also gauged as poor plaintiff's

abilities to carry out very short and simple instructions; maintain regular

attendance and be punctual within customary, usually strict tolerances;

sustain an ordinary routine without special supervision; work in

coordination with or proximity to others without being unduly distracted;

make simple work-related decisions; accept instructions and respond

appropriately to criticism from supervisors; get along with co-workers or

peers without unduly distracting them or exhibiting behavioral extremes;
respond appropriately to changes in a routine work setting; deal with
normal work stress; and be aware of hazards and take appropriate
precautions.  AT 270.  He found that plaintiff had no ability to maintain
attention for a two hour segment, complete a normal work day and work
week without interruptions from psychologically based symptoms, or to
perform at a consistent pace without an unreasonable number and length
of rest periods.  AT 270.

   Dr. Landes described as fair plaintiff's ability to understand and
remember detailed instructions, but found his abilities to carry out detailed
instructions, set realistic goals or make plans independently of others, and
deal with stress of semiskilled and skilled work were poor.  AT 270-71.
Dr. Landes also described as fair plaintiff's capacity to interact
appropriately with the general public, adhere to basic standards of
neatness and cleanliness, and travel in unfamiliar places, but rated as
poor plaintiff's abilities to maintain socially appropriate behavior, and use
public transportation.  AT 271.  In his report Dr. Landes opined that
plaintiff's impairments cause a moderate degree of limitation with respect
to his activities of daily living, while causing a marked limitation with

respect to his ability to maintain social functioning, with frequent

deficiencies with respect to concentration, persistence, or pace resulting

in his failure to complete tasks in a timely manner.  AT 271.  Dr. Landes

added that plaintiff's impairments cause him to experience episodes of

deterioration or decompensation in work or work-like settings on a

repeated basis, noting plaintiff's hypersensitivity to environmental factors

such as heat, noise, activity, and complexity.  AT 272.

Plaintiff was consultatively examined on June 9, 2005 by Dr. Kristen

Barry, Ph.D.  AT 222-23.  Based upon testing conducted, including

administering of the WAIS-III test, Dr. Barry assigned a verbal intelligence

("IQ") score of 110, a performance IQ of 104 and a full scale IQ score of

107, concluding that plaintiff's general cognitive functioning appeared to

fall within the average range.  AT 224-25.  Based upon her evaluation, Dr.

Barry observed that

> [a]t this time, [claimant], is able to follow and understand
> simple directions and instructions.  He is able to maintain his
> attention and concentration in a structured environment.  He is
> a very intelligent individual who is functioning in the average
> range of intelligence.  He states that he has a history of
> numerous head injuries which have led to poor short-term
> memory.  He also has difficulty handling stress and becomes
> easily anxious.  Claimant may have difficulty relating
> adequately with others and handling stressors adequately.

AT 226.  Dr. Barry concluded that plaintiff's allegations regarding his condition were consistent with the results of the examination and opined that with continuation of treatment and services, from a psychological standpoint, plaintiff's prognosis was fair.  *Id.*

Beginning on or about November 2, 2006, plaintiff sought treatment from the Office of Mental Health ("OMH") clinic at the Onondaga Pastoral Counseling Center ("OPCC"), where was seen by Dr. Thomas Maltese.[12] AT 353-81.  Based upon his treatment of the plaintiff over time, on October 18, 2007 Dr. Maltese completed a medical assessment of plaintiff's ability to do work related mental activities.  AT 379-91.  In it, Dr. Maltese opined that 1) plaintiff's ability to maintain attention and concentration, understand, remember, and carry out simple instructions, and maintain his personal appearance was fair; 2) his ability to follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisors was markedly limited; 3) his ability to behave in an emotionally stable manner, relate predictably in social situations, and

---

[12]     Although commencement of that treatment predates his decision, Administrative Law Judge Robert E. Gale did not have before him the OPCC treatment records at the time his opinion was written, those documents instead having been offered as "new evidence" by plaintiff's counsel to the Social Security Administration Appeals Council.  *See* AT 351.

demonstrate reliability was poor; and 4) the plaintiff had no ability to deal with work stress, function independently, or understand, remember and carry out complex or detailed job instructions.  *Id.*

The physical aspects of plaintiff's head trauma have been treated by various sources.  Among them are professionals affiliated with the Strong Memorial Hospital's Epilepsy Center ("Center"), where plaintiff was seen over time beginning in or about February of 2004.  AT 118-32.  From February 9 through 14, 2004, plaintiff underwent a longer term video/electroencephalogram ("EEG") study at Strong Memorial under the direction of Dr. James Burchfiel, Ph. D.  AT 129-30.  As a result of the study Dr. Burchfiel found that plaintiff's interictal EEG was completely within normal limits during both waking and normal sleep, and that his waking and sleep backgrounds were well-organized.  AT 129.  Dr. Burchfiel noted no epileptiform discharges during either waking or sleep, adding that plaintiff's EEG remained normal even after discontinuation of plaintiff's anti-seizure medication.  *Id.*  He explained that none of plaintiff's described spells developed during monitoring despite aggressive methods of inducement, including photic stimulation, hydro ventilation, sleep deprivation, exercising, and fasting.  AT 129.  Dr. Burchfiel characterized

the results of the monitoring as somewhat inconclusive in the absence of

plaintiff's typical spells, but nonetheless reported that the extensive EEG

recording showed no evidence of epilepsy and opined that it was very

unlikely that plaintiff had an active epileptic seizure disorder.  AT 130.  In

an accompanying discharge summary, Dr. Michel J. Berg also found that

plaintiff exhibited no evidence of epilepsy.  AT 127-28.

       In a report of treatment authored on January 17, 2004 by Dr.

Gieuseppi Erba, at Strong Memorial, based upon plaintiff's recounting of

his seizure in July of 2002 and upon physical examination, Dr. Erba noted

that plaintiff's registration and recall were three out of three, that he

successfully performed serial sevens, and that his naming and

comprehension were intact.  AT 121-23.  Dr. Erba also noted that

plaintiff's cranial nerve and motor examinations were normal, as was his

gait, and that he was able to toe walk in tandem gait without difficulty.  *Id.*

       On March 17, 2004, Dr. Erba again treated plaintiff at Strong

Memorial.  AT 125-26.  Dr.  Erba noted that a psychosocial assessment

made by a Dr. Nickels revealed no evidence to support any specific

psychiatric diagnosis, but "strongly recommended" a referral for therapy to

assist plaintiff with coping mechanisms and preservation of self esteem.

AT 126. Dr. Nickels' impression was that plaintiff had poor coping mechanisms and was psychosocially affected by multiple stressors, including the loss of close family members, loss of employment, and significant financial difficulties.  AT 125.

On May 20, 2004, plaintiff again treated at Strong Memorial.  AT 119-20.  On that occasion Dr. Erba opined that it was likely that plaintiff's symptoms–left sided spasms, visual problems, episodes of flaccidity in the left arm, poor energy level, anxiety, difficulty with concentration, poor short-term memory, and left eye pain – had a psychosomatic component and may also have been post-concussion syndrome-related.  *Id.*  Dr. Erba reported his belief that plaintiff's mental health needed to be addressed, and that psychiatric evaluation and therapy would help plaintiff return to work.  AT 120.  Dr. Erba further concluded that if plaintiff continued to remain unproductive, "he would have more time to ruminate, which would cause more depression, more anxiety, and a greater decrease in energy level.  Therefore, we feel it is imperative that he should return to work as soon as possible, even on a part-time basis . . . ."  AT 120.

In addition to his head trauma and the resulting mental and emotional impact of that injury, plaintiff has complained over time of

15

several other conditions, including chest pain, described as dull and achy, back pain, hypertension, hyperlipidemia, sleep apnea, gastroesophageal reflux disease ("GERD"), and bilateral myopia with some astigmatism, but with both eyes correctable to twenty-twenty.  AT 16, 60; *see also* AT 203 (opinion from Dr. Paul S. Cohen, dated April 20, 2005, noting that he has followed plaintiff several of those conditions, but emphasizing that none of them have impeded his ability to work).

During the hearing in this matter plaintiff gave testimony regarding his normal, daily activities.  Plaintiff reported that he lives alone in an apartment, but that his son visits him on Tuesdays and Thursdays.   AT 389.  Plaintiff testified that he cares for his son on those days, preparing meals and assisting with homework, hygiene, and post-surgery care, and that he prepares his son for school the following mornings.  AT 91, 389-90, 400-01.  Plaintiff reported being able to tend to his personal hygiene and prepare simple, finger-food oriented meals twice per week.  AT 92.  Amrod is able to shop once every one to two weeks for between half-an-hour and two hours.  AT 93.  Plaintiff identified watching television, playing cards, and reading as activities in which he engages on a daily basis.  AT 93.  He noted that he also enjoys playing with his son and selling personal

items as other interests.  AT 93.  Plaintiff testified that he watches

televison for between half-an-hour and three hours each week.  AT 400-

01.

Plaintiff states that his illnesses affect his physical capacities.

Amrod reports that he can walk for between one-quarter and one-half mile

before he has to stop and rest, and that when he does it takes him half-

an-hour to fully recover.  AT 94.  He testified, however, that the maximum

distance he can walk at any one time before having to stop is one mile.

AT 401.  Plaintiff testified that the maximum amount of weight he can lift

on an occasional basis is thirty-five pounds.  AT 401.  He testified that he

can stand for twenty minutes and sit for half-an-hour to an hour.  AT 401-

02.  Plaintiff reports that he has difficulty maintaining attention due to what

he characterized as "very poor short-term memory . . . ."  AT 94.  Amrod

testified that he also has difficulty managing his money.  AT 93, 403.

II.   PROCEDURAL HISTORY

A.   Proceedings Before The Agency

On February 10, 2005, plaintiff filed applications for DIB and SSI

benefits, alleging that he became disabled on January 15, 2005 due to a

head injury, memory difficulties, nervousness, depression, an eye

17

problem, a back condition, learning issues, seizures, a heart problem, high blood pressure, anxiety, and back pain.[13]   AT 39-41, 57-58, 317-20; 384.  Those applications were denied on June 23, 2005.  AT 21-24, 321-24.

At plaintiff's request, a hearing was conducted on January 19, 2007 before Administrative Law Judge ("ALJ") Robert E. Gale to address plaintiff's request for Social Security benefits.  AT 382-415.  Appearing at the hearing were the plaintiff, accompanied by a non-attorney representative from the Legal Aid Society of Mid-New York, as well as Mary Lou Crittenden, a witness who testified on his behalf.  *Id.; see also* AT 13, 37.

Following the close of the hearing, ALJ Gale issued a decision dated February 15, 2008 in which, after conducting a *de novo* review of the available evidence, he concluded that plaintiff was not disabled at the relevant times and thus ineligible to receive the requested benefits.  AT 10-19.  In his decision the ALJ reviewed the record and applied the now-familiar, five-step sequential test for determining disability.  At step one,

---

[13]   Plaintiff filed prior applications for DIB and SSI benefits in April of 2003; those applications were denied after an administrative hearing, and on petition for review by the Social Security Administration Appeals Council.  *See* Plaintiff Brief (Dkt. No. 12) at 1, n. 1; *see also* AT 384.

18

the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of January 15, 2005.  AT 15. At steps two and three of the disability algorithm, ALJ Gale determined that two of plaintiff's conditions – anxiety disorder and post-concussion syndrome – were sufficiently severe to significantly interfere with his ability to perform basic work activities, but that those impairments did not, either alone or in combination, meet or medically equal any of the listed, presumptively disabling impairments set forth in the governing regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  AT 16-17.

Before proceeding to step four of the disability analysis, ALJ Gale surveyed the medical record in order to determine plaintiff's RFC, finding that

> the claimant has the residual functional capacity to lift/carry 20-35 pounds occasionally and 20 pounds frequently, and sit, stand and/or walk up to 6 hours each in a routine workday; along with the mental capacity to understand, remember and perform simple tasks in a structured environment; learn new simple tasks; work in a low stress environment defined as only occasional judgment required, only occasional interaction with the public and can be around other employees throughout the workday but only occasional conversations and interpersonal interaction.

AT 17.  In arriving at this determination, ALJ Gale considered but rejected

plaintiff's statements concerning the extent of his limitations.  AT 18.

At step four of the analysis the ALJ noted plaintiff's past relevant work experience as an LPN, but made no finding as to his ability, given the RFC finding, to perform in that position.  AT 18.  Instead, ALJ Gale proceeded to step five; after applying his RFC finding as well as plaintiff's other relevant features at this step, relying upon Rule 202.21 or, alternatively, Rule 202.20 of the grid, he concluded that a finding of no disability was warranted.  AT 18-19.  The ALJ thus determined that plaintiff was not under disability, as defined under the Act, at any time from January 15, 2005 through the date of his decision.  AT 19.

The ALJ's opinion became a final determination of the agency on March 26, 2008, when the Social Security Administration Appeals Council denied plaintiff's request for review of that decision.  AT 6-8, 325-26.

B.    This Action

Having exhausted his available internal administrative remedies, plaintiff commenced this action on April 30, 2008.  Dkt. No. 1.  Issue was thereafter joined on August 15, 2008 by the Commissioner's filing of an answer, Dkt. No. 9, preceded by the submission on August 6, 2009 of an administrative transcript of the evidence and proceedings before the

agency, Dkt. No. 7.  With the filing of plaintiff's brief on October 30, 2008,

Dkt. No. 12, and that on behalf of the Commissioner on April 3, 2009, Dkt.

No. 16, the matter is now ripe for determination and has been referred to

me for the issuance of a report and recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(d).  *See also* FED. R. CIV. P. 72(b).[14]

III.    DISCUSSION

    A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal

v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.Supp.2d

145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d

---

[14]    This matter has been treated in accordance with the procedures set forth
in General Order No. 18 (formerly, General Order No. 43) which was issued by the
Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998,
and subsequently amended and reissued by Chief District Judge Frederick J. Scullin,
Jr., on September 12, 2003.  Under that General Order an action such as this is
considered procedurally, once issue has been joined, as if cross-motions for judgment
on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.

983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether

the Commissioner applied the proper legal standards, his decision should

not be affirmed even though the ultimate conclusion reached is arguably

supported by substantial evidence.  *Martone*, 70 F.Supp.2d at 148 (citing

*Johnson*, 817 F.2d at 986).  If, however, the ALJ has applied the correct

legal standards and substantial evidence supports the ALJ's findings,

those findings are conclusive, and the decision should withstand judicial

scrutiny regardless of whether the reviewing court might have reached a

contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586;

*Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13

F.Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. §

405(g).

The term "substantial evidence" has been defined as "'such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217

(1938)); *Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be

substantial, there must be "'more than a mere scintilla'" of evidence

scattered throughout the administrative record.  *Richardson*, 402 U.S. at

401 (quoting *Consolidated Edison Co.*, 308 U.S. at 229, 59 S.Ct. at 219);

*Martone*, 70 F.Supp.2d at 148 (quoting *Richardson* ).  "To determine on

appeal whether an ALJ's findings are supported by substantial evidence, a

reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must

also include that which detracts from its weight."  *Williams*, 859 F.2d at

258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S. Ct.

456, 464 (1951)).

When a reviewing court concludes that an ALJ has applied incorrect

legal standards, and/or that substantial evidence does not support the

agency's determination, the agency's decision should be reversed.  42

U.S.C. § 405(g); *see Martone*, 70 F.Supp.2d at 148.  In such a case, the

court may remand the matter to the Commissioner under sentence four of

42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to

develop a full and fair record or to explain his or her reasoning.  *Martone*,

70 F.Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir.

1980)).  A remand pursuant to sentence six of section 405(g) is warranted

if new, non-cumulative evidence proffered to the district court should be

considered at the agency level.  *See Lisa v. Sec'y of Dep't of Health and*

*Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Ret. Bd.*, 982 F.2d 49, 57 (2d Cir.1992); *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

> B.     Disability Determination - The Five-Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of
> such severity that [s]he is not only unable to do h[er] previous
> work but cannot, considering h[er] age, education, and work
> experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of
> whether such work exists in the immediate area in which [s]he
> lives, or whether a specific job vacancy exists for h[er], or
> whether [s]he would be hired if [s]he applied for work.  For the
> purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy" means

24

work which exists in significant numbers in the region where
such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be
employed in determining whether an individual is disabled.  *See* 20 C.F.R.
§§ 404.1520, 416.920.  The first step requires a determination of whether
the claimant is engaging in substantial gainful activity; if so, then the
claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§
404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then
the second and third steps involve an examination of whether the claimant
has a severe impairment or combination of impairments which significantly
restricts his or her physical or mental ability to perform basic work
activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer
from such an impairment, the agency must next determine whether it
meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.*
§§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so,
then the claimant is "presumptively disabled."  *Martone*, 70 F.Supp.2d at
149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20
C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an

assessment of whether the claimant's RFC precludes the performance of

his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If it is

determined that it does, then as a final matter the agency must examine

whether the claimant can do any other work.  *Id.* §§ 404.1520(g),

416.920(g).

The burden of showing that the claimant cannot perform past work

lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996);

*Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it

becomes incumbent upon the agency to prove that the claimant is capable

of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that

burden has been met, the ALJ should consider the claimant's RFC, age,

education, past work experience, and transferability of skills.  *Ferraris*, 728

F.2d at 585; *Martone*, 70 F.Supp.2d at 150.

      C.   <u>The Evidence In This Case</u>

Plaintiff makes a number of arguments in support of his request for

reversal of the Commissioner's decision.  Initially, Amrod asserts that the

Commissioner's determination, including his RFC finding, is not supported

by substantial evidence and results from an unbalanced and selective

evaluation of the evidence, placing undue emphasis on a consultative

report of Dr. Barry and impermissibly discounting the more extensive

report of Dr. Landes.  The plaintiff next asserts that the ALJ's resort to the

grid was improper in light of the presence of non-exertional impairments of

sufficient severity to significantly erode the job base upon which the grid is

predicated and make that mechanical formulation inappropriate for

application in this case as a framework for finding disability.  Lastly, the

plaintiff assigns error to the ALJ's summary and unexplained rejection of

his statements regarding his limitations as not fully credible.

          1.    <u>Selective Consideration of Evidence</u>

     Plaintiff first argues that the ALJ discriminately considered the

evidence, citing those portions of the record lending support to his findings

but ignoring others – specifically, information regarding the treatment and

assistance Amrod received as a result of his traumatic brain injury

diagnosis – which detract from his findings.

     In his decision, the ALJ purports to have reached his conclusion

only "[a]fter careful consideration of all the evidence . . . ."  AT 14.  The

ALJ acknowledged the special assistance plaintiff has received over time

in light of his traumatic brain injury and noted that a report issued in

conjunction with plaintiff's TBIW program showed that he could be

expected to experience some problems with unusually demanding types of work, though not simple, basic unskilled work tasks.  AT 17.  The ALJ also claims to have considered opinion evidence from Dr. Landes and Dr. Mozeleski, as well as from Clinical Social Worker Chris Flagg, all of which tended to detract from his ultimate determination.  *See* AT 16-17.

When the evidence of record permits a court to glean the rationale of an ALJ's decision, the ALJ need not have mentioned every item of testimony presented nor "have explained why he [or she] considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).  While I might have arrived at a different result, considering the same evidence as that surveyed by the ALJ, I am unable to say either that his analysis was flawed and overlooked relevant, contrary evidence, or that the determination regarding plaintiff's RFC is not supported by substantial evidence.  This argument, then, does not provide a basis for reversal.

2.      Mental Impairment–Special Technique

Implicit in plaintiff's arguments is the contention that the ALJ failed to properly evaluate his non-exertional, mental limitations and to apply the

special technique required under 20 C.F.R. §§ 404.1520a and 416.920a

to determine whether his mental impairments were severe.  Defendant

counters that the ALJ's analysis comported with the requirements

imposed under 20 C.F.R. §§ 404.1520a and 416.920a.

When considering a mental impairment at the second and third

steps of the sequential analysis, an ALJ must apply a "special technique"

set forth in 20 C.F.R. §§ 404.1520a(a) and 416.920a(a) to determine

whether it is severe.  *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir.

2008) (citation omitted).  First, the ALJ must consider whether the

claimant has a medically determinable impairment, and is required to rate

the degree of claimant's functional limitation resulting from the impairment

in four areas, including 1) activities of daily living; 2) social functioning; 3)

concentration, persistence, or pace; and 4) episodes of

decompensation.[15]  20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3).  These

areas are rated on a scale of "none, mild, moderate, marked, and

extreme."  20 C.F.R. §§ 404.1520a(c)(4); 416 .920a(c)(4).  Generally, if

---

[15]     "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Kohler*, 546 F.3d at 266 n.5 (citation omitted).

the degree of limitation in the first three areas is mild or none and there are no reported episodes of decompensation, then the impairment is not severe.  *See* 20 C.F.R. § 1520a(d)(1); 416.920a(d)(1).  An ALJ's failure to apply the special technique warrants a remand absent a finding of harmless error.  *See O'Connell v. Astrue*, 2009 WL 606155, at *21 (N.D.N.Y. Mar. 9, 2009) (Kahn. J. and Bianchini, M. J.) (citing *Kohler*, 546 F.3d at 267-69, n.9 and explaining that although the Second Circuit found that failure apply the special technique was legal error, it had left open the possibility that an ALJ's failure to apply the special technique would be harmless error, as when, they suggested, "an ALJ actually complied with the special technique by making determinations regarding a [claimant's] degree of limitation . . . but merely fail[ed] to strictly comply with the documentation requirement . . . .").

In this instance, the ALJ made specific findings regarding plaintiff's functional limitations.  He discerned mild restrictions in plaintiff's activities of daily living and ability to maintain social functioning, moderate restrictions with respect to his ability to maintain concentration, persistence, or pace, and no episodes of decompensation. AT 17.  The ALJ's decision therefore reflects his application of the special technique

and contains specific findings with respect to each of the four functional

areas described in 20 C.F.R. § 404.1520a(c).  Remand on this basis is

therefore not required.

### 3.   Medical Opinion Weight

Also embedded within plaintiff's arguments is his claim that the ALJ

improperly discounted the opinion of Dr. Landes without either a sufficient

basis or proper explanation.  While conceding that a medical source

statement rendering an opinion regarding a claimant's ability to work is

neither controlling nor deserving of significant weight, plaintiff nevertheless

also challenges the weight assigned by the ALJ to an opinion of Dr. Dean

Mozeleski, a psychiatrist, setting forth certain diagnoses and stating that

plaintiff is "unable to work at this time."  *See* AT 316.  In addition, plaintiff

appears to challenge the ALJ's heavy reliance on Dr. Barry's opinion.

Defendant counters that the ALJ rendered a disability determination

properly based on the totality of the evidence of record, with proper

consideration given to Dr. Landes' opinion.

Ordinarily, the opinion of a treating physician is entitled to

considerable deference, provided that it is supported by medically

acceptable clinical and laboratory diagnostic techniques and is not

31

inconsistent with other substantial evidence.  *Veino*, 312 F.3d at 588;

*Barnett*, 13 F.Supp.2d at 316.[16]  Such opinions are not controlling,

however, if they are contrary to other substantial evidence in the record,

including the opinions of other medical experts.  *Halloran v. Barnhart*, 362

F.3d 28, 32 (2d Cir. 2004); *Veino*, 312 F.3d at 588.  Where conflicts arise

in the form of contradictory medical evidence, their resolution is properly

entrusted to the Commissioner.  *Veino*, 312 F.3d at 588.

In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he

duration of a patient-physician relationship, the reasoning accompanying

the opinion, the opinion's consistency with other evidence, and the

physician's specialization or lack thereof[.]"  *Schisler v. Sullivan*, 3 F.3d

563, 568 (2d Cir.1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

---

[16]    The regulation which governs treating physicians provides:

Generally, we give more weight to opinions from your
treating sources . . . . If we find that a treating source's
opinion on the issue(s) of the nature and severity of your
impairment(s) is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in your
case record, we will give it controlling weight.  When we do
not give the treating source's opinion controlling weight, we
apply [various factors] in determining the weight to give the
opinion.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When a treating physician's opinions are repudiated, the ALJ must provide reasons for the rejection. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The failure to apply the appropriate legal standards for considering a treating physician's opinions is a proper basis for reversal and remand, as is the failure to provide reasons for rejection of his or her opinions. *Johnson v. Bowen*, 817 F.2d at 985-86; *Barnett*, 13 F.Supp.2d at 316-17.

In his decision the ALJ acknowledged an opinion from Dr. Dean Mozeleski, *see* AT 316, described as an "attending psychiatrist," to the effect that plaintiff is unable to work, but properly noted that opinions regarding the ability to work are specifically reserved to the Commissioner.[17] AT 17. To the extent that his opinions as well as those of Dr. Landes speak to the ultimate issue of disability, they are not entitled to special deference since the regulations specifically reserve the issue to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Addressing the opinions of Dr. Mozeleski, the ALJ also explained that a contemporaneous evaluation by Onondaga-Cortland-Madison

---

[17]    The record does not disclose the extent of Dr. Mozeleski's participation in efforts to diagnose and treat plaintiff's mental condition.

Board of Cooperative Educational Services "suggested that it would be reasonable" for plaintiff to "begin to explore future employment . . . ."  AT 17; *see* AT 314 (noting that work tryouts and volunteer positions at schools and libraries would be considered and that "[w]ithin the next few weeks/months it is expected that [plaintiff] will be gathering information from work tryouts, volunteer situations as well as those employed in areas of interest and those who instruct curriculums leading to these jobs so as to better define whether his goal is commensurate with his needs and capabilities").  To the extent plaintiff challenges the ALJ's dismissal of Dr. Mozeleski's opinion without attempting to further develop the record as constituting error, I find that the argument is misplaced. An ALJ has an obligation to seek further clarification from a medical source when he or she finds a medical report to be unclear or ambiguous.  *See* 20 C.F.R. § 404.1512(e)(1).  Further development of the record is also required when an ALJ determines that a treating physician's opinion is not well supported by medically acceptable diagnostic and clinical evidence.  *See Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir.1999); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998).  Neither of these circumstances is evident here.

Turning to reports of Dr. Landes, the ALJ accorded "little substantive

weight" to his opinion that due to emotional and cognitive factors, plaintiff cannot work at all. AT 16. Explaining the weight assigned to opinions of Dr. Landes, the ALJ observed that the assessment appeared to reflect plaintiff's assertions rather than his medical history or clinical data. AT 16. The ALJ also noted that Dr. Landes' testing suggested "mild cognitive dysfunction . . . ." *Id.; see* AT 279 (explaining in part the basis for Dr. Landes' impression that plaintiff had "some form of mild organic thought disorder"). The ALJ further cited Dr. Landes' observation that plaintiff's symptoms appeared to respond well to Risperdal. AT 16; *see* AT 279. The ALJ contrasted Dr. Landes' opinion with that of Dr. Barry, finding that Dr. Barry's opinion was consistent with the balance of plaintiff's medical history, while Dr. Landes' opinion lacked this consistency. AT 16.

Other evidence of record lends support to the weight accorded by the ALJ to Dr. Landes' opinion. I note, initially, that Dr. Landes himself cast some doubt on the reliability of his conclusions, candidly acknowledging that plaintiff's atypical approach to testing greatly limited the specificity of interpretation and confidence with which he drew conclusions with respect to plaintiff's condition. AT 276. It is apparent, moreover, that Dr. Landes also did not regard himself as treating source.

In the mental impairment questionnaire completed by Dr. Landes, he noted that he had not treated plaintiff, but rather had merely evaluated him.  AT 268.  In any event, Dr. Landes found that most of plaintiff's underlying cognitive abilities were intact and fell within the average range with some, including primary memory, language and basic attention capacity, rated as superior.  AT 276.  Additionally, with respect to Dr. Barry, the ALJ pointed to her findings that plaintiff was "able to follow and understand simple directions and instructions, maintain attention/concentration normatively, though he might have some slight difficulty handling stress and dealing with other people."  AT 16.  The ALJ found that while Dr. Barry's evaluation and report "did not conclude any specific results" they were nonetheless "very thorough and the results [that she] reached [were] comprehensive."  AT 16, 18.  The ALJ therefore accorded Dr. Barry's examination results considerable weight.  AT 18.

The evidence of record does not contradict the ALJ's finding.  As was noted above, Dr. Barry found that plaintiff maintained appropriate eye contact, that his speech was fluent and clear, that he showed adequate expressive and receptive language skills, that his thought processes were coherent and goal directed, that his affect was full and appropriate to his

speech and thought content, that his sensorium was clear and that he was oriented to person, place, and time.  AT 230-31.  Dr. Barry concluded that despite plaintiff's complaints regarding his memory, his attention, concentration, and recent and remote memory skills were intact, and he could count and perform simple calculations and serial sevens.  *Id.*  She also found that plaintiff's cognitive functioning was average, that his general fund of information appeared appropriate to his experience, and that his insight and judgment were fair to good.  *Id.*  Dr. Barry also observed that Amrod could follow and understand simple directions and instructions, and was able to maintain his attention and concentration in a structured environment.  AT 231.

"It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence."  *Monguer v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted); *Provost-Harvey v. Comm'r of Soc. Sec.*, 2008 WL 697366, at *6 (N.D.N.Y. Mar. 13, 2008) (McAvoy, S. J.) ("The evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence.") (citations omitted). "The mere fact that the evidence

considered by the ALJ is conflicting or internally inconsistent does not require elicitation of further medical opinions; it is the function of the ALJ to weigh conflicting evidence and resolve any discrepancies." *Martin v. Commissioner of Social Sec.*, 2008 WL 4793717, at *10 n.9 (N.D.N.Y. Oct. 30, 2008) (Sharpe, J. and Peebles, M. J.) (citation omitted).  There is nothing of record suggesting that the ALJ overlooked Dr. Landes' or Dr. Barry's respective opinions, or that the ALJ failed to weigh the conflicting or internally consistent evidence or set forth the factors crucial to his determination in this regard.  *See Ferraris*, 728 F.2d at 587; *cf. Snell* v. *Apfel*, 177 F.3d at 129 -134.  The ALJ's explanation of the weight assigned to the respective opinions of Dr. Landes, Dr. Barry and Dr. Mozeleski was adequate, and finds the support of substantial evidence. Accordingly, remand on this basis is unwarranted.

       4.   <u>Plaintiff's Credibility</u>

In arriving at his determination, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  AT 18.  Plaintiff argues that the ALJ's credibility

assessment lacks the support of substantial evidence and that the ALJ

failed to adequately explain his rationale for rejecting his statements.

Defendant responds that the ALJ considered the relevant factors in

assessing plaintiff's credibility.

It is well within the discretion of the Commissioner to evaluate the

credibility of a claimant's complaints and render an independent judgment

in light of the medical findings and other evidence.  *See Mimms v.*

*Heckler*, 750 F.2d 180, 185-86 (2d Cir. 1984); Social Security Ruling

("SSR") 96-7p, 1996 WL 374186, Titles II and XVI: Evaluation of

Symptoms in Disability Claims: Assessing the Credibility of an Individual's

Statements (S.S.A. 1996).  "Since symptoms sometimes suggest a

greater severity of impairment than can be shown by objective medical

evidence alone," all information submitted by a claimant concerning his or

her symptoms must be considered.  20 C.F.R. §§ 404.1529(c)(3),

416.929(c)(3). The claimant's testimony alone carries independent weight;

to require a claimant to fully substantiate his or her symptoms with

"medical evidence would be both in abrogation of the regulations and

against their stated purpose."  *Matejka v. Barnhart*, 386 F.Supp.2d 198,

207 (W.D.N.Y. 2005) (citing *Castillo v. Apfel*, No. 98 CIV. 0792, 1999 WL

147748, at *7 (S.D.N.Y. Mar. 18, 1999)).

The regulations prescribe a specific process that an ALJ must follow in weighing a claimant's testimony.  The ALJ must first establish that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b).  If the ALJ finds such an impairment, then the ALJ next evaluates the intensity and persistence of the symptoms to determine how the symptoms limit the claimant's functioning.  20 C.F.R. §§ 404.1529(c), 416.929(c).

A claimant's testimony is entitled to considerable weight when it is consistent with and supported by objective clinical evidence demonstrating that the claimant has a medical impairment which one could reasonably anticipate would produce such symptoms.  *Barnett v. Apfel*, 13 F.Supp. at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a). If clinical evidence does not fully support the claimant's testimony concerning the intensity, persistence, or functional limitations, then the ALJ must consider additional factors, including 1) daily activities; 2) location, duration, frequency, and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness, and

side effects of any medications taken to relieve symptoms; 5) other treatment received; and 6) any other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3) (i)-(vi).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  *Martone*, 70 F.Supp.2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Although the ALJ is free to accept or reject such testimony, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams v. Bowen*, 859 F.2d at 260-61 (citation omitted).  Where substantial evidence supports the ALJ's findings, the decision to discount subjective testimony may not be disturbed on court review.  42 U.S.C. § 405(g); *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).  The requirements for judging the credibility of a claimant are well-summarized in an agency ruling, which provides that

> [t]he reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in

> the regulations for evaluating symptoms. The determination or
> decision must contain specific reasons for the finding on
> credibility, supported by the evidence in the case record, and
> must be sufficiently specific to make clear to the individual and
> to any subsequent reviewers the weight the adjudicator gave
> to the individual's statements and the reasons for that weight.

Social Security Ruling ("SSR") 96-7P, 1996 WL 374186, at *4 (SSA 1996);

see also Cloutier v. Apfel, 70 F.Supp.2d 271, 278 (W.D.N.Y. 1999)

(holding that although the ALJ's decision contained a discussion of the

medical evidence and a summary of the plaintiff's subjective complaints,

the decision did not provide a sufficient analysis of the evidence to support

the lack of credibility finding).

Immediately preceding his credibility determination, the ALJ

observed that plaintiff enjoyed a very wide range of daily activities, citing

his personal hygiene, housework, cooking, shopping and relationship with

his son.  AT 18.  Although the ALJ did not discuss these activities in great

detail, he clearly considered them in assessing plaintiff's credibility.  Id.  In

that regard, the record reveals that plaintiff cares for his special needs son

twice a week.  AT 389-90.

It is not clear, however, that the ALJ properly considered the

balance of factors enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv) or

otherwise adequately explained his reasoning.  Although the ALJ noted

that plaintiff's "inability to stay with linear, goal-processing thought patterns

. . . . appeared to respond to Risperdal . . . ," AT 16, he did not address

any of the other medications taken by the plaintiff, including Diovan,

Effexor XR, Klonopin, Lipitor, Nexium, Welbutrin and Zetia.  AT 65; *see*

*Crysler v. Astrue*, 563 F.Supp.2d 418, 442 (N.D.N.Y. 2008).  Beyond

merely noting Dr. Landes' finding that plaintiff became "easily

overwhelmed," the ALJ addressed neither the location, duration,

frequency, and intensity of plaintiff's symptoms, nor the precipitating and

aggravating factors leading to his symptomology.  For example, the ALJ

did not address plaintiff's reported inability to handle noise and motion

stimulation, *see* AT 53, nor did he discuss plaintiff's inability to "shut

down" his environment, or his claim that he has a "very low threshold for

anxiety."  *See* AT 395.   Moreover, the ALJ addressed neither plaintiff's

testimony that as he became more anxious, he would begin shaking and

stuttering, nor his reports that he had auditory and visual hallucinations.

*See* AT 404-05.

    In sum, I find that the explanation given by the ALJ for rejecting

plaintiff's claims of disability symptomology is significantly inadequate and

fails to satisfy the requirements of C.F.R. § 404.1529(c).  The resulting

determination must therefore be set aside and the matter remanded for further consideration.

### 5.   RFC Determination

Plaintiff next argues that the ALJ's RFC determination suffers from multiple defects and is contrary to the substantial evidence of record.  A claimant's RFC represents a finding of the range of tasks he or he is capable of performing notwithstanding the impairments at issue.  20 C.F.R. §§ 404.1545(a), 416.945(a).  Consideration of a claimant's physical abilities, mental abilities, and symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis, all inform an RFC determination.  *Id.*; *Martone*, 70 F.Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess his or her exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. §§ 404.1545(b), 404.1569a, 416.945(b), 416.969a.  The ALJ must also consider nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations.  20 C.F.R. §§ 404.1545(b), 404.1569a, 416.945(b), 416.969a; *see also* 20 C.F.R. Part 404, Subpt. P,

App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F.Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 587). An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations.  *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F.Supp. 180, 183 (N.D.N.Y. 1990) (McAvoy, J.)); *Sobolewski v. Apfel*, 985 F.Supp. 300, 309-10 (E.D.N.Y. 1997).

Under the controlling guidelines, including those embodied in SSR 96-8p, an RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  SSR 96-8p, 1996 WL 374184, at *7, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims (SSA 1996).  The failure of an ALJ to explain the evidence that supports his or her finding regarding a claimant's RFC can warrant reversal of the ultimate finding of no disability.  *Mendoza v.* Astrue, 2008 WL 5054243, at *13 (N.D.N.Y. Nov. 20, 2008) (Hurd, J.).

In arriving at his RFC determination, the ALJ relied upon the medical

evidence in the record, including reports generated by treating and

consulting physicians, and found that plaintiff's statements with respect to

the intensity, persistence, and limiting effects of his alleged symptoms

were not entirely credible.  While the ALJ's recitation of the evidence

relied upon to support the physical component of his RFC finding is only

marginally adequate, it provides guidance as to the basis for those

findings, which are supported by substantial evidence.

Addressing the physical aspects of the RFC determination, the ALJ

noted that the results of an exercise stress test were normal.  AT 18; *see*

AT 170-71.  The ALJ also noted that the result of a basic physical

consultative examination were normal.  AT 18.  This finding lacks support

from the record, however, which does not appear to disclose any physical

consultative examination results.  *See* AT 2-4.  It is true that a state

agency disability analyst completed a "physical residual functional

capacity assessment" on June 16, 2005; that assessment, however,

appears to be based upon nothing more than a review of then available

medical records.[18]  *See* AT 242-47.  "[A] disability analyst is not considered

---

[18]      The administrative transcript suggests that a "DDS physician" completed
the physical RFC assessment.  AT 3.  The assessment itself, however, does not
indicate that it was completed by a physician.  AT 242-47.

to be an acceptable medical source under the Regulations." *Bell v. Astrue*, No. 7:06-CV-865, 2008 WL 4936830, at *11 (N.D.N.Y. Nov. 18, 2008) (Kahn, J. and Homer, M. J.) (quoting *Hopper v. Comm'r of Soc. Sec.*, No. 06-CV-0038, 2008 WL 724228, at *10 (N.D.N.Y. Mar. 17, 2008)).

Nonetheless, other evidence of record lends support to the physical component of the ALJ's RFC determination.  Despite limiting the scope of his opinion to plaintiff's cardiac condition, Dr. Beshara opined that plaintiff had no limitations with respect to his ability to lift and carry, stand and/or walk, sit, or push and/or pull.  AT 181-82.  Similarly, Dr. Cohen found that none of the conditions for which he treated plaintiff impeded his ability to work.  AT 203.

Plaintiff's challenge to the agency's determination appears to center upon alleged flaws in the mental element of his RFC.  *See* Dkt. No. 12, Pl.'s Br. at 17 ("Plaintiff's severe mental impairments prevent him from the [sic] performing work activity, at any level.").  In addressing this RFC component, the ALJ generally placed considerable reliance on the opinion of Dr. Barry, as detailed above, which offered support for his findings as to plaintiff's mental limitations.  AT 18; *see* AT 222-27, 228-33.  Other

evidence of record tends also to lend support to the ALJ's RFC determination.  Dr. Kamin found that plaintiff has anxiety-related disorders, which caused a moderate degree of limitation in his activities of daily living, and maintenance of social functioning, concentration, persistence or pace.  AT 252-65.  He further found that plaintiff has never experienced repeated episodes of deterioration of extended duration.  *Id.*  Similarly, Social Worker Chris Flagg described plaintiff as quite bright, and characterized his orientation, memory, and fund of information as good and his ability to perform calculations as very good.  AT 210-16.  While these findings are not opinions of a treating source, they are entitled to some weight and can provide substantial evidence for an RFC determination.  *See Pease v. Astrue*, 2008 WL 4371779, at *9-11 (N.D.N.Y. Sept. 17, 2008) (Mordue, C.J.).

The ALJ specifically cited Dr. Landes' assessment report dated August, 25, 2005 as an underpinning for his RFC determination, noting that "[t]he RFC is based on the fact that the most comprehensive discussion of post-concussion effects show[ed] basically within-normal-limits results . . .."[19]  AT 18 (citing Exhibit B-21F, which appears at  AT

---

[19]     Dr. Landes' report offers some support to the ALJ's RFC determination. In describing plaintiff's prognosis, Dr. Landes noted that plaintiff may have "substantial

273-79).  Curiously, earlier in his decision the ALJ found that Dr. Landes'

opinions were not entitled to significant weight.  AT 16.  It is not clear to

the court that these disparate positions can be reconciled; the fact that an

ALJ finds an opinion or report sufficiently reliable to serve in substantial

part as the basis of a claimant's RFC strongly suggests that it must carry

more than "little substantive weight."

Robbed of its basis, the mental component of the ALJ's RFC

determination does not find the support of substantial evidence, providing

yet another basis for reversal of the Commissioner's determination.

### 6.   Medical Vocational Guidelines

Plaintiff's final argument is that the Commissioner failed to offer any

vocational evidence to support the finding that jobs capable of being held

by the plaintiff are available in the national and local economies, and that

his exclusive reliance instead on the grid to satisfy his burden at step five

was inappropriate.  The ALJ observed that when a "claimant cannot

---

improvement."  AT 268.  In notes from a feedback session, Dr. Landes found it was significant that plaintiff had presented with an appreciably better mental status after having begun a trial of low-dose Risperdal.  AT279.  He found plaintiff to be "more organized and linear, with much less idiosyncratic ideation and less digression and tangentiality.  [Patient] reports feeling much better as well, with better focus and less anxiety."  AT 279.  Dr. Landes also found that most of plaintiff's underlying cognitive abilities were intact and fell within the average range with some, including for example, primary memory, language, and basic attention capacity, rated as superior.  AT 276.

perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking . . . ."  AT 19.  Looking to Rule 202.21 as providing a frame of reference, the ALJ further explained that plaintiff's "additional and relatively slight mental limitations have little or no effect on the occupational base of unskilled light work" and that a finding of not disabled was appropriate.  AT 19.

The grid was designed to assess a claimant's RFC, age, education, and work experience to determine whether the claimant can engage in any substantial gainful work existing in the national economy.  *Rosa*, 168 F.3d at 78 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2).  Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grid.  *Rosa*, 168 F.3d at 78; *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).

Whether or not the grid should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved.  *Bapp*, 802 F.2d at 605.  If a plaintiff's situation fits well within a particular classification, then resort to the grid is appropriate.  *Id.*  If, on the other hand, nonexertional impairments,

including pain, significantly limit the range of work permitted by exertional

limitations, then use of the grid is inappropriate, in which case further

evidence and/or testimony is required.[20]  *Rosa*, 168 F.3d at 78; *Bapp*, 802

F.2d at 605-06.

In this instance it is readily apparent that plaintiff's non-exertional

impairments are of sufficient severity to significantly diminish his ability to

perform unskilled light work.  "[I]n a case where both exertional and

nonexertional limitations are present, the guidelines cannot provide the

exclusive framework for making a disability determination."  *Bapp*, 802

F.2d at 605.  If nonexertional limitations significantly limit a claimant's

ability to perform the full range of a particular work category, then the

Commissioner must introduce either the testimony of a vocational expert

or other similar evidence regarding the existence of jobs in the national

economy that the plaintiff can perform.  *Edel v. Astrue*, 6:06-CV-0440,

2009 WL 890667, at *24 (N.D.N.Y. Mar. 30, 2009) (Kahn, J. and

---

[20]     As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's
> impairments that affect [his or] her ability to meet the
> requirements of jobs other than strength demands, and
> includes manipulative impairments and pain.

*Sobolewski*, 985 F. Supp. at 310 (citing 20 C.F.R. § 404.1569(a), (c)).

51

Bianchini, J.) (citing *Bapp*, 802 F.2d at 604).

It appears fairly evident in this case that plaintiff's mental condition has the capacity to significantly interfere with his ability to perform a full range of work contemplated under the grid, providing a third basis for reversal of the Commissioner's determination.  *See Veino*, 312 F.3d at 587; *see also DiVetro v. Comm'r*, No. 5:05-CV-830, 2008 WL 3930032, *12 (N.D.N.Y. Aug. 21, 2008) (Sharpe, J.).

IV.    SUMMARY AND RECOMMENDATION

While the ALJ in this case appears to have considered all of the relevant medical evidence bearing upon plaintiff's conditions and resulting limitations, his RFC finding is not supported by substantial evidence in the record, particularly with respect to its mental aspects; his rejection of plaintiff's subjective claims of regarding his limitations is neither well-supported nor properly explained; and, his reliance upon the grid was inappropriate, given plaintiff's non-exertional limitations of sufficient severity to significantly erode the job base upon which the grid is predicated.  For these reasons, the Commissioner's determination should be reversed and the matter remanded for further proceedings consistent

with this opinion.[21]

RECOMMENDED that plaintiff's motion for judgment on the pleadings be GRANTED, the Commissioner's determination of no disability be VACATED, and the matter REMANDED to the agency for further consideration.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of Court within ten (10) days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1) (2006); FED. R. CIV. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with

---

[21]     Although plaintiff seeks remand solely for the calculation of benefits, such a course is not appropriate in this case.  Reversal and remand for the calculation of benefits is only warranted "when there is 'persuasive proof of disability' [in the record] and further development of the record would not serve any purpose."  *Steficek v. Barnhart*, 462 F. Supp. 2d 415, 418 (W.D.N.Y. 2006) (quoting *Rosa*, 168 F.3d at 83).  Remand for further consideration, on the other hand, is the proper course when the ALJ has applied an improper legal standard, or further findings and explanations would clarify the ALJ's decision.  *See Rosa*, 168 F.3d at 82-83; *Parker*, 626 F.2d at 235; *Steficek*, 462 F. Supp. 2d at 418 (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).  In this instance, remand is required for the purpose of making further findings and offering additional explanations of the evidence, and not because of a finding that there is persuasive proof of disability in the existing record.

this court's local rules.

Dated:     November 6, 2009  
              Syracuse, New York

David E. Peebles  
U.S. Magistrate Judge